# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

JAMES D. SELELYO; STEPHANIE P.
SELELYO,

      Plaintiffs,

v.                                    CASE NO. 2: 09-CV-261-FtM-36DNF

ALFREDO J. SARARO, III; SARARO
HOLDINGS, LLC; ALANA SARARO;
FIFTH THIRD BANK,

      Defendants.

_____/

## ORDER

      **THIS CAUSE** is before the Court on the Dispositive Motion to Dismiss Plaintiffs' Second

Amended Civil Action Complaint, filed by Defendant Fifth Third Bank (Dkt. 109).  Defendants

Alfredo Sararo, Sararo Holdings, LLC and Alana Sararo (the "Sararo Defendants")  also filed a

Dispositive Motion to Dismiss Plaintiffs' Second Amended Complaint (Dkt. 121).  Plaintiffs filed

an omnibus response in opposition (Dkt. 124).  Defendant Fifth Third Bank replied to Plaintiffs'

response in opposition (Dkt. 131).  For the reasons stated below, the Court will grant Defendants'

Motions to Dismiss due to lack of standing.

## I.    BACKGROUND[1]

### A.    Relationship Among Plaintiffs, Robert Horgos and Defendants

      This case involves an alleged real estate scheme among Plaintiffs, Robert P. Horgos

("Horgos") and Defendants.  Horgos served as a judge in the Court of Common Pleas of Allegheny

---

[1]The facts in this section are taken from Plaintiffs' Second Amended Complaint.

County, Pennsylvania for approximately 20 years (Dkt. 105, ¶19).  Plaintiffs have maintained a

close, personal friendship with Horgos for many years.  *Id*. at ¶18.  Horgos also befriended Alfredo

Sararo ("Sararo") who was employed as a probation officer in Allegheny County from 1997 to 1999.

*Id*. at ¶19.

In 2000, Sararo moved from Pennsylvania to Florida and still maintained his friendship with

Horgos.  *Id*. at ¶20.  After speaking with Sararo, Horgos purchased a condominium unit in Collier

County, Florida.  *Id*. at ¶21.  At the time of purchase, the unit was in its "pre-development phase."

*Id*.  This transaction was the first of several investments in Florida real estate in which Horgos would

engage with the assistance of Sararo.

B.     **Real Estate Investment Scheme in Florida**

1.     *The Pre-Foreclosure Program*

Beginning in 2003, Sararo worked with "Curt Johnson" (or Kirk Meyers), Vice-President

of Fifth Third, the manager of Fifth Third's Vanderbilt Road office and an associate of Sararo, other

employees of Fifth Third,[2] Sararo Holdings, LLC ("Sararo Holdings") and Alana Sararo to induce

Horgos to participate as an investor in Fifth Third's "pre-foreclosure program."  *Id*. at ¶¶26-27.

Through this Program, Fifth Third made available to "preferred customers," such as Horgos, the

opportunity to purchase distressed properties at below-market prices prior to the institution of

foreclosure proceedings.  *Id*.

The scheme operated as follows: Sararo, with the assistance of Johnson, identified parcels

of real estate to be in the "pre-foreclosure program."  *Id*. at ¶28.  At Sararo's request, Horgos then

---

[2]  Plaintiffs originally alleged their claims against several employees of Fifth Third,
including Frances Agosto, Maria Rowe, and Katie Geyer.  However, these individuals have been
dismissed from this action.

funded an account at Fifth Third.  *Id.* At the time of closing, Fifth Third would transfer the funds from Horgos' account to the closing agents, and the money would then be withdrawn by Sararo to purchase the "selected properties." *Id.*  Employees of Fifth Third would make telephone calls from the Fifth Third branch in Florida to Horgos' chambers in Pittsburgh, Pennsylvania, send him facsimile messages, and mail documents and other papers to facilitate the transactions. *Id.* at ¶31.

This real estate scheme continued from 2003 to 2008.  *Id.* at ¶29.  During this time, it is alleged that Sararo and Johnson instigated the purchase of various properties to defraud Horgos of money by concealing from him the facts of each transaction, including their interest in the transaction, whether the property was truly part of a program with Fifth Third, the identity of the original owners, the sale prices, the costs of the transactions, and other significant information related to the sale.  *Id.*

However, only the transactions that occurred in 2005 and 2006 form the basis of Plaintiffs' complaint.

### 2.    *Horgos' Participation in the Program in 2003*

Late in 2003, Sararo and Horgos conversed about real estate investments in Florida.  *Id.* at ¶22.  In November 2003, Sararo led Horgos to speak to Johnson by telephone.  *Id.*  It was suggested to Horgos that he could participate in the Pre-Foreclosure Program if he refinanced his home in Sewickley, Pennsylvania and used the equity to invest in Florida real estate.  *Id.*  Based on this suggestion, Horgos applied to Fifth Third for a mortgage on his home in Pennsylvania, paid for an appraisal of his home and faxed his personal financial information to Johnson from Pennsylvania. *Id.* at ¶23.

During the last week of December 2003, Fifth Third approved Horgos' refinancing application and on December 29, 2003 disbursed to Horgos a check for the loan proceeds in the

amount of $469,573.00.  *Id*. at ¶¶24-25.  The loan was deposited into Horgos' Fifth Third account, and the proceeds were to be used solely for the purchase of investment properties and not disbursed to Sararo.  *Id*.

**3.   *Real Estate Purchase by Horgos/Sararo in 2005-06***

Approximately a year before December 2005, Sararo and others told Horgos about a "beach front mansion" located near Naples, Florida whose owners were in financial difficulty.  *Id*. at ¶32.  The property was going to be placed by Fifth Third into the Pre-Foreclosure Program.  *Id*.  In late 2005, Sararo informed Horgos by mail and/or telephone that Johnson and Fifth Third wanted Horgos to tender $25,000 as a down payment on the mansion, or he would lose the opportunity to purchase it.  *Id*. at ¶35.  Horgos tendered the down payment.  *Id*.  Thereafter, Sararo continued to tell Horgos that he would need to provide additional money in order to purchase the property, and if he did not, he would forfeit the down payment that he had already made.  *Id*. at ¶36.  Fifth Third notified Horgos that he would need to deposit additional money by January 4, 2006 to purchase the propery, or he would risk losing the money that he had already deposited.  *Id*. at ¶39.

In early December 2005, Horgos contacted Plaintiffs and told them about the property and the Pre-Foreclosure Program.  *Id*. at ¶38.  He also told Plaintiffs that he could resell the property by February 26, 2006 and make a profit of as much as $500,000.  *Id*.  However, Horgos needed to borrow $450,000 from Plaintiffs to complete the transaction.  *Id*.  Horgos stated that he had already invested $450,000 of his own money.  *Id*. at ¶40.  Based on this information from Horgos, Plaintiffs agreed to give Horgos a personal loan of $450,000 so he could complete the purchase of the property.  *Id*.  Horgos drafted and executed a loan agreement and agreed to give Plaintiffs $100,000 in interest.  *Id*. at ¶41; Ex. 1.  Subsequently, Horgos deposited the loan from Plaintiffs into his Fifth Third account.  *Id*. at ¶42.

At some point in December 2005, Sararo notified Horgos that his down payment was late, his deposit would be forfeited. *Id*. at ¶43.  Furthermore, Fifth Third no longer agreed to sell Horgos the mansion. *Id*.  Horgos then asked Sararo if he could stop the forfeit of his deposit. *Id*. at ¶44.  Sararo stated that Fifth Third and Johnson would be willing to let Horgos use the money to purchase two other properties located in Port Charlotte, Florida on Cannolot Boulevard ("Cannolot Properties"). *Id*. at ¶45.  Sararo further stated that Horgos could purchase both properties for $900,000 and then resell them by February 28, 2006 at $1.4 million. *Id*. at ¶46.  Sararo used Horgos' money to purchase the Cannolot Properties but titled them in his own name by warranty deeds from the record owners on January 31, 2006. *Id*. at ¶¶47-49.

### 4.     *Real Estate Transfers in 2006 by Sararo*

By quitclaim deeds on March 15, 2006, which were recorded on March 31, 2006, Sararo transferred a fifty percent (50%) interest in each of the Cannolot Properties to Horgos without Horgos' knowledge or consent. *Id*. at ¶50; Exs. 2, 3.  On June 26, 2006, it is alleged that Sararo, with the assistance of Johnson and others, fraudulently transferred one of the Cannolot Properties into his name alone by forging Horgos' signature on various documents, including a quitclaim deed. *Id*. at ¶51; Ex. 4.  On the same day, Sararo, with the assistance of others whose identities are presently unknown to Plaintiffs, transferred all of the ownership interest in the other Cannolot Property to Horgos by a quitclaim deed. *Id*. at ¶53; Ex. 6.  Sararo transferred this second property without Horgos' authorization, information, knowledge or consent. *Id*.

At these times, Sararo, Johnson and employees of Fifth Third had documents requiring Horgos' signature to be notarized although they were not signed by him in their presence. *Id*. at ¶54.  The documents were signed only by Sararo with other signature lines left blank. *Id*.  Furthermore, with documents purporting to have Horgos' signature, these individuals did not first determine

whether the person signing the documents was Horgos.  *Id*. at ¶55.

On November 7, 2006, Sararo then transferred the Cannolot Property owned by him to Eric Harrington by a warranty deed, recorded in the Charlotte County Clerk's Office on November 17, 2006.  *Id*. at ¶52; Ex. 5.  This transfer was done without Horgo's consent or knowledge, and Sararo kept all of the proceeds from the sale.  *Id*.

With the exception of a power of attorney, documents bearing Horgos' purported signature were executed in Florida without Horgos' permission and while he was located in Pennsylvania.  *Id*. at ¶56.  As a result of the actions of Sararo, Johnson and Fifth Third, Horgos did not have the ability to repay Plaintiffs all or part of the $550,000 due and owed to them.  *Id*. at ¶58.

Based on knowledge and belief, Plaintiffs assert that neither they nor Horgos have received any of the proceeds, income or mortgage principal from the transfers in 2006.[3]  *Id*. at ¶¶59-60.  Plaintiffs did not learn of the scheme until May 7, 2007.  *Id*. at ¶61.

## II.  **PROCEDURAL HISTORY**

Plaintiffs filed their initial complaint on April 30, 2009 (Dkt. 1).  The Court directed the parties to appear for an evidentiary hearing to address the issue of standing (Dkt. 48).  Following the hearing, the Court dismissed Plaintiffs' complaint as a shotgun pleading and gave them leave to file an amended complaint (Dkt. 63).  Plaintiffs filed an amended complaint on June 24, 2010 (Dkt. 67).  Because Plaintiffs failed to properly serve certain individuals, the Court dismissed several Defendants, including employees of Fifth Third (Dkts. 74, 75, 120).

The remaining Defendants filed motions to dismiss, which the Court granted (Dkt. 103).  The Court permitted Plaintiffs to file a second amended complaint, which they did on November 4, 2010.

---

[3]  Plaintiffs reference a loan taken against one of the Cannolot Properties, but they fail to allege when this loan was obtained and who initiated the mortgage.

*Id*.; Dkt. 105. Plaintiffs allege four claims: 1) Racketeer Influenced and Corrupt Organizations ("RICO") against Defendants; 2) Civil Conspiracy against Defendants; 3) Fraud against Defendants Alfredo Sararo, Sararo Holdings and Fifth Third Bank; and 4) Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA") against the Sararo Defendants.

## III.   ANALYSIS

In separate memoranda, Defendants present the same arguments for dismissing Plaintiffs' Second Amended Complaint. First, Defendants argue that Plaintiffs' Second Amended Complaint is still a shotgun pleading. Second, Defendants contend that Plaintiffs failed to join an indispensable party, Horgos. Third, Defendants argue that Plaintiffs lack standing to bring their four claims against them. Fourth, Defendants contend that Plaintiffs have failed to state a claim upon which relief can be granted.

In opposition, Plaintiffs first argue that their Second Amended Complaint meets the general pleading requirements and should not be dismissed as a shotgun pleading. Second, Plaintiffs contend that they have standing to bring their claims against Defendants. Third, Plaintiffs argue that Horgos is not an indispensable party. Fourth, Plaintiffs argue that they have properly alleged claims for RICO violations, civil conspiracy, fraud and FDUPTA violations.

### A.   Shotgun Pleading

Defendants contend that Plaintiffs' Second Amended Complaint is a shotgun pleading because: 1) Plaintiffs included previously dismissed Defendants; and 2) Plaintiffs reference an amended complaint in a separate case (Dkt. 109, pp. 6-7; Dkt. 121, p. 3). In opposition, Plaintiffs assert that: 1) the Second Amended Complaint meets the general pleading requirements; 2) Plaintiffs filed a motion to dismiss relating to the previously dismissed Defendants (Dkt. 112); and 3) the reference to the other complaint is moot because Plaintiffs moved to strike (Dkt. 128) the reference

in that complaint (Dkt. 124, pp. 9, 39-40).

The previously dismissed Defendants were again "dismissed" pursuant to Plaintiffs' Motion to Dismiss (Dkts. 112,118), and judgments were entered accordingly (Dkts. 119, 120). The reference to the separate complaint in another case was stricken (Dkts. 128, 130). The Court finds that Plaintiffs' Second Amended Complaint is not a shotgun pleading and complies with the pleading requirements.

### B.      Indispensable Party

Defendants also contend that Plaintiffs failed to join Horgos as an indispensable party under Fed. R. Civ. P. 12(b)(7) and 19(a) (Dkt. 109, pp. 7-8; Dkt. 121, pp. 3-4). Defendants note that Horgos, not Plaintiffs, had the alleged relationship with them. *Id.* Further, without Horgos, Defendants assert that they will be exposed to possible inconsistent determinations of identical claims. *Id.* In response, Plaintiffs rely on *Shibata v. Lim*, 133 F. Supp. 2d 1311 (M.D. Fla. 2000) to support their assertion that Defendants "have done nothing to show the continuation of this case would impair their interest or expose them to the substantial risk of a double recovery or inconsistent obligations" (Dkt. 124, pp. 14-15).[4] Furthermore, Plaintiffs note that Defendants opposed Plaintiffs' motion to consolidate this action with the one brought by Horgos and pending in the Middle District of Florida. *Id.* at pp. 15-16. Plaintiffs also state that they filed a separate Pennsylvania state action

---

[4] The Court notes a distinction between the present matter and *Shibata*. In *Shibata*, the defendants argued that complete relief could not be granted to them unless the plaintiff sued his son. *Shibata*, 133 F. Supp. 2d at 1319. The defendants contended that the plaintiff's son was a joint tortfeasor and under a theory of contribution, he would be liable to them if they were liable to the plaintiff. *Id.* However, the defendants did not file and serve the plaintiff's son with a third-party complaint. *Id.* Because the Eleventh Circuit has stated that joint tortfeasors need not all be joined in one lawsuit, the District Court found that the plaintiff's son was not an indispensable party. *Id.* at 1319-20 (citing *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 847 (11th Cir. 1999)). In this case, no party has asserted that Horgos was a joint tortfeasor or asserted a theory of contribution.

against Horgos based on the loan agreement, and if that matter is resolved, Defendants could claim all or part of such a recovery as a credit or set-off to all or part of any verdict for Plaintiffs in this case. *Id*. at 16.

"Under Rule 12(b)(7) of the Federal Rules of Civil Procedure, a party may move to dismiss a complaint for 'failure to join a party under Rule 19.'" *Shibata*, 133 F. Supp. 2d at 1315. "Rule 19[5] states a two-part test for determining whether a party is indispensable. First, the court must ascertain under the standards of Rule 19(a) whether the person in question is one who should be joined if feasible. If the person should be joined but cannot be (because, for example, joinder would divest the court of jurisdiction) then the court must inquire whether, applying the factors enumerated in Rule 19(b), the litigation may continue." *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263, 1279-80 (11th Cir. 2003)(citation omitted). For the first determination, pragmatic concerns, including the effect on the parties and the litigation, control. *Id*. at 1280

---

[5] This Rule provides:

(a) Persons Required to Be Joined If Feasible. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

(b) When Joinder Is Not Feasible. If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include: (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

(citations omitted); *see Shibata*, 133 F. Supp. 2d at 1316.  The burden is on the movant to show the nature of the unprotected interests of the absent parties.  *West Peninsular Title Co. v. Palm Beach County*, 41 F.3d 1490, 1492 (11th Cir. 1995).

Here, the Defendants have not established that Horgos is an individual who is required to be joined as set forth in Rule 19(a).  They have not demonstrated the nature of the unprotected interests of Horgos.  It is undisputed that Horgos has already filed suit against them.  *See Horgos v. Sararo*, Case No. 2:09-CV-163-FtM-29SPC.  It is disingenuous of Defendants to argue that Horgos' absence exposes them to inconsistent adjudication of claims and possible double liability, when they opposed a motion to consolidate this case with the *Horgos* action.  Additionally, Plaintiffs have filed suit in state court against Horgos for breach of contract.  That case is or was pending in the Court of Common Pleas of Beaver County, Pennsylvania, Case No. 12688-2008.  Defendants have failed to establish that Horgos is an indispensable party.

### C.    Standing

Defendants contend that Plaintiffs lack standing to pursue their claims against them because: 1) there are no allegations in the Second Amended Complaint that Plaintiffs ever interacted with any of Defendants; 2) Plaintiffs' claims belong to Horgos who has already filed suit against Defendants; 3) Plaintiffs gave a personal loan to Horgos that he breached; 4) Plaintiffs never expected to have an interest in any property that Horgos purchased; and 5) Plaintiffs simply are not the real parties in interest (Dkt. 109, pp. 9-12; Dkt. 121, p. 4; Dkt. 131, pp. 4-5).  Plaintiffs do not directly argue against Defendants' general assertion that they lack standing.  However, Plaintiffs do address the standing issue in their discussion of the proximate cause requirement for their RICO claim.

"[The] [s]tanding doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal

rights . . . ." *Allen v. Wright*, 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984).  "[The Supreme Court] ha[s] consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Raines v. Byrd*, 521 U.S. 811, 818-19, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997); *see Lujuan v. Defenders of Wildlife*, 504 U.S. 555, 560 n. 1, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)("By particularized, we mean that the injury must affect the plaintiff in a personal and individual way."). The Florida Rules of Civil Procedure further support this understanding that only the real party in interest may pursue a claim.  "Every action may be prosecuted in the name of the real party in interest . . . ." Fla. R. Civ. P. 1.210(a).  "Standing depends on whether a party has a sufficient stake in a justiciable controversy, with a legally cognizable interest which would be affected by the outcome of the litigation." *Weiss v. Johansen*, 898 So.2d 1009, 1011 (Fla. 4th DCA 2005).  "Standing encompasses not only this 'sufficient stake' definition, but also the requirement that the claim be brought by or on behalf of one who is recognized in law as a 'real party in interest,' that is the person in whom rests, by substantive law, the claim sought to be enforced." *Id*. (citing *Kumar Corp. v. Nopal Lines, Ltd*, 462 So.2d 1178, 1183 (Fla. 3d DCA), review denied, 476 So.2d 675 (Fla. 1985)).

Standing is a doctrine that implicates subject matter jurisdiction.  *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005).  Because standing is such a critical jurisdictional doctrine, the Court must consider it first.  *Id*. (citing *Bischoff v. Osceola County*, 222 F.3d 874, 877-78 (11th Cir. 2000)).  If a district court determines that there is no standing and, thus, no subject matter jurisdiction, it cannot hear the merits of the case.  *Id*. at 974-75 (citing *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999)); *see* Fed. R. Civ. P. 12(b)(1).  Furthermore, when there is a factual dispute as to standing, the district court cannot rely solely on the paper record to

determine whether standing exists. *Bischoff*. 222 F.3d at 881. Instead, the district court must conduct an evidentiary hearing to evaluate the live testimony of witnesses. *Id*.[6] Based on this notion, the Court conducted an evidentiary hearing on the issue of standing, The Court has considered the testimony from that hearing in determining whether Plaintiffs have standing to pursue their four claims against Defendants.

### 1.    *James Selelyo's testimony demonstrates that he had no relationship or interaction with Defendants.*

During the evidentiary hearing, Selelyo testified that he and his wife gave Horgos a personal loan of $450,000 in December 2005 and January 2006 (Dkt. 66, pp. 60, 72-73).[7] He further testified that he and his wife had no relationship with Fifth Third Bank. *Id*. at p. 76. Even when Horgos defaulted on the personal loan, Selelyo never contacted Fifth Third Bank to find out what happened to the money. *Id*. at pp. 81-83. Selelyo did not testify that he ever spoke to Sararo about the real estate transaction. Selelyo simply relied on Horgos' representations on what Horgos did with the money. *Id*. at p. 89. It is undisputed that the money given to Horgos was a personal loan and not money given in order for Horgos to purchase property on behalf of Plaintiffs. *Id*. at p. 92. Plaintiffs did not expect to take title to real estate in Florida. Instead, they were simply looking for a $100,000 profit on their loan to Horgos (Dkt. 66, pp. 92-94). Notably, after Horgos defaulted on the loan,

---

[6] Where facts are in dispute, some courts have found that standing is a question of fact that can be determined after the motion to dismiss stage or by a jury. *See Morris v. Bischoff*, No. 96-1384-Civ-T-17A, 1997 WL 128114, at *3 (M.D. Fla. Mar. 4, 1997)("Whether a party is a real party in interest is a question of fact. A motion to dismiss is therefore not the appropriate place in which to determine who were the real parties in interest to this transaction."); *see* discussion *infra* p. 16*, Weiss v. Johansen*, *et al*. Here, the facts relevant to standing are not in dispute.

[7]Plaintiff Stephanie Selelyo did not attend the hearing. James Selelyo testified that he had most of the contact with Horgos and there would be no variance between his testimony and that of his wife (Dkt. 66, pp. 18-19).

Selelyo learned through his own research that Horgos purchased two properties in Florida for a little more than $600,000, not $900,000, the amount that Selelyo initially believed was the price of the "beachfront mansion". *Id.* at pp. 98-100.

Based on this undisputed testimony, Selelyo did not have a relationship or interactions with Defendants regarding the real estate investment plan or the personal loan to Horgos. Furthermore, Selelyo relied on Horgos' representations alone regarding the real estate plan and price of the breachfront mansion.

### 2. *Plaintiffs do not have standing to assert their RICO violations against Defendants.*

Defendant Fifth Third argues that Plaintiffs' injuries were not proximately caused by the commission of predicate acts, and their allegations do not establish that they have standing to pursue their RICO claim against Defendants (Dkt. 109, pp. 15-18). In support of this argument, Fifth Third relies on *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 992, 175 L. Ed. 2d 943 (2010). The Sararo Defendants join this agument generally (Dkt. 121, p. 4). In opposition, Plaintiffs contend that they have alleged facts sufficient to show that Defendants' actions proximately caused their injury and have established standing for their RICO claims (Dkt. 124, pp. 19-23). Plaintiffs rely on *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131, 170 L. Ed. 2d 1012 (2008) to demonstrate that they were the targets of Defendants' real estate scheme because Defendants knew that Horgos did not have the money to continue paying to further the investment plan.

In *Hemi Group,* the Supreme Court considered the facts and holding of *Bridge* in determining that the plaintiffs did not have standing under RICO. The plaintiffs in *Bridge* were competing and unsuccessful bidders at a county tax-lien auction. *Bridge*, 553 U.S. at 643-44. The liens were profitable, even at the lowest possible bid, which resulted in multiple bidders offering the

same low bid.  *Id*.  The county that was offering the bids at the auction devised a plan to allocate the liens on a rotational basis, which prohibited bidders from using agents to bid on their behalf resulting in a disproportionate share of bids.  *Id*.  The Supreme Court held that the plaintiff met the RICO causation requirement to assert its claim against the winning bidders, the defendants.  *Id*. at 657-58.  The plaintiff's theory of causation in *Bridge* was "straightfoward".   Because of the zero-sum nature of the action, and because the county awarded bids on a rotational basis, each time a fraud-induced bid was awarded, a particularly legitimate bidder was passed over and injured by the defendants' misrepresentations.  *Id*.

In *Hemi Group*, New York City filed RICO claims against the defendants, wholesalers of cigarettes online, because the defendants sold cigarettes directly to City residents but failed to submit the sales information to the State of New York.  *Hemi Group*, 130 S. Ct. at 987-88.  This failure prevented the State from transmitting the information to the City so that it could collect cigarette taxes from the City residents.  *Id*.  In finding that the City did not have standing to pursue its RICO claims against the defendants, the Supreme Court emphasized that the wrongful conduct that directly caused the harm to the plaintiff was distinct from the conduct giving rise to the fraud: "Here, the conduct directly responsible for the City's harm was the customers' failure to pay their taxes.  And the conduct constituting the alleged fraud was Hemi's failure to file Jenkins Act reports. Thus . . . the conduct directly causing the harm was distinct from the conduct giving rise to the fraud."  *Id*. at 989-90.   The Court further noted that there was a better-situated plaintiff, the State of New York, that had an incentive to pursue the RICO claims.  *Id*.  Consistent with this rationale, the Eleventh Circuit has continued to require a party plaintiff to demonstrate that the defendant's misconduct was the direct cause of his injury.  *Halpin v. Crist*, 405 Fed. Appx. 403, 405 (11th Cir. Dec. 14, 2010)(citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 266, 112 S. Ct.

1311, 117 L. Ed. 2d 532 (1992)).[8]

Here, the allegations in the Second Amended Complaint coupled with Selelyo's testimony support a finding that Plaintiffs do not have standing to pursue their RICO claim against Defendants. First, Plaintiffs are comparable to the plaintiffs in the *Hemi Group* case. The conduct directly causing Plaintiffs' harm is distinct from the conduct giving rise to the alleged fraud. *See* Dkt. 66, pp. 80-81, 83, 88-92. Horgos harmed Plaintiffs when he failed to repay the loan. The alleged fraud, *sub judice*, was Defendants' representations to Horgos about the real estate investments in Florida. Second, Horgos, like the State of New York, is a better-situated plaintiff with incentive to pursue RICO claims against Defendants, and he has done so. As such, the Court finds that Plaintiffs do not have standing to pursue their RICO claim against Defendants.

### 3.    *Plaintiffs do not have standing to assert their civil conspiracy and fraud claims against Defendants.*

The parties do not specifically address Plaintiffs' standing to pursue their civil conspiracy and fraud claims against Defendants. Rather, they argue, generally, that Plaintiffs do not have standing to pursue any of their claims. The Court will address the question of standing as to the remaining three claims.

In analyzing standing as to the civil conspiracy and fraud claims, the Court considers *Weiss v. Johansen, et al.*, 898 So.2d 1009 (Fla. 4th DCA 2005). In that case, Weiss entered into a purchase agreement with Johansen to purchase a boat. *Id*. at 1010. Weiss executed the agreement individually and in his own name. *Id*. Johansen agreed to perform certain repairs on the boat prior

---

[8] *See also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006); *Liquidation Com'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1350 n. 14 (11th Cir. 2008); *Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1287 (11th Cir. 2006); *Byrne v. Nezhat*, 261 F.3d 1075, 1110 (11th Cir. 2001); *Bivens Gardens Office Building, Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 906 (11th Cir. 1998).

to delivery to Weiss.  *Id.*  Based on the promise to perform repairs, Weiss put $50,000 in an escrow account to ensure Johansen's performance.  *Id.*  After finalizing the agreement, Weiss transferred ownership of the boat to Green Shoe Ltd., a foreign entity.  *Id.* at 1011.  The company was wholly-owned by Weiss.  *Id.*

After closing on the agreement, Weiss learned that Johansen had misrepresented the number of working generators on the boat.  *Id.* at 1010.  Johansen represented that there were two working generators when there was only one.  *Id.*  Additionally, Johansen directed his employees to fill cracks in the mast of the boat with putty and paint over them to conceal the defects.  *Id.*  Weiss argued that he would not have agreed to purchase the boat had he known about the deficiencies.  *Id.*  Based on this information, Weiss withheld the escrow funds, which led Johansen to file suit.  *Id.*  Weiss filed a counterclaim against Johansen and a third-party claim against Johansen's manager.  *Id.*  Johansen and his manager argued that Weiss lacked standing to assert his fraud and civil conspiracy claims because Green Shoe Ltd.was the legal owner of the boat and was not joined as an indispensable party.  *Id.* at 1011.

The Fourth District Court of Appeals found that "Weiss clearly possesse[d] standing to assert [his fraud] claim since '*relief in equity against fraud is personal to the one defrauded*.'"  *Id.* at 1012. (quoting *Maling Corp. v. Ladan Corp.*, 85 So.2d 607, 608 (Fla. 1956))(emphasis added).  Weiss alleged in his complaint that Johansen and his agents made false representations and concealed defects in the boat, "upon which Weiss detrimentally relied in order to induce him to purchase the vessel at issue."  *Id.*  Weiss also alleged that he suffered an injury as a result of the purchase.  *Id.*  As to the civil conspiracy and fraud claims, the Court found that there was "a material question of fact . . . as to whether Weiss should be considered a real party in interest to his claims . . . ."  *Id.*

In comparison, the instant case does not present the same dispute over the real party in

- 16 -

interest.  First, in *Weiss*, it was undisputed that Johansen made several misrepresentations to Weiss and not to the corporation during the negotiations.  Here, Defendants allegedly made several misrepresentations to Horgos.  Based on Selelyo's testimony, no one other than Horgos made any representations to him or his wife.  The only person that Selelyo spoke with about the loan and the real estate investment plan was Horgos.  Second, Weiss was no longer the owner of the boat. Because of the transfer of title to the corporate entity, the Court found that there was a dispute as to who, or what, was the real party in interest.  In the present case, it is undisputed that Selelyo never expected or agreed to have an interest or title in the real estate that Horgos planned to purchase. Selelyo merely loaned money to Horgos, which Horgos failed to repay.  Throughout the course of the real estate scheme, Horgos, not Plaintiffs, was the real party in interest.  Horgos was the party who obtained title to the properties.   As such, this Court finds that Plaintiffs are not the real parties in interest and do not have standing to pursue civil conspiracy and fraud claims against Defendants.[9]

### 4.    *Plaintiffs do not have standing to assert their FDUPTA claim against the Sararo Defendants.*

The Sararo Defendants contend that Plaintiffs' FDUPTA claim should be dismissed because Plaintiffs have not identified a trade or commerce that they engaged in with them (Dkt. 121, p. 7). In opposition, Plaintiffs contend that Defendants' argument that they did not engage in a trade or

---

[9]  *See Maling Corp.*, 85 So.2d at 608 (Fla. 1956)(noting that a claim of fraud is personal to the one who is defrauded by the misrepresentations); *see also Vanderbilt Mortgage and Finance, Inc. v. Flores*, 735 F. Supp. 2d 679, 691 (S. D. Tex. 2010)("Intervenors simply cannot meet the standing test when they allege securities fraud or other harms visited upon investors or financial institutions, rather than themselves.  Such allegations cannot form the basis of any cause of action.  The Court concludes that Intervenors lack standing to assert a fraud cause of action based upon securities fraud."); *Winkins v. Frank Winther Investments, Inc.*, 881 S.W. 2d 557 (Aug. 4, 1994 Tex. Civ. App.)("A person making a representation is only accountable for its truth or honesty to the very person or persons whom he seeks to influence; no one else has a right to rely on the representation and to allege its falsity as a wrong to him under a claim of fraud.")(citations omitted).

commerce is without merit (Dkt. 124, pp. 37-38).  Plaintiffs further note that based on the changes in Florida case law regarding individuals who may bring FDUPTA claims, they have standing to pursue their claims against Defendants.  *Id.*

"The purpose of the FDUPTA is '[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1333 (11th Cir. 2008)(quoting Fla. Stat. §501.202(2)). "To bring a claim under this Act, the plaintiff must have been aggrieved by the alleged unfair and deceptive act." *Id.* (citations omitted).  This cause of action requires that the alleged deceptive conduct proximately cause the actual damages. *Green v. McNeil Nutritionals, LLC*, No. 2004-0379-CA, 2005 WL 3388158, at *4 (Fla. 4th DCA Nov. 16, 2005).  "An actual consumer who 'did not suffer any actual damages proximately caused by' the alleged deception cannot maintain a claim for damages under FDUPTA." *Id.* (quoting *Gen. Motors Acceptance Corp. v. Laesser*, 718 So.2d 276, 277 (Fla. 4th DCA 1998).

In this case, Plaintiffs allege that Sararo, on his own behalf and others, made false and deceptive statements to Horgos with regard to the Pre-Foreclosure Program, ownership, price and availability of real estate. *Id.* at ¶103.  Again, the Sararo defendants made no misrepresentations to Plaintiffs.  Plaintiffs relied solely on Horgos' assertions, even those that turned out to be inaccurate relating to the purchase of the beachfront mansion.  As such, the Court finds that Plaintiffs do not have standing to pursue their FDUPTA claim against the Sararo defendants.

Accordingly, it is hereby **ORDERED** and **ADJUDGED** as follows:

1.     Defendant Fifth Third Bank's Motion to Dismiss Plaintiffs' Second Amended Civil Action Complaint (Dkt. 109) is **GRANTED** for lack of standing.

2.      Defendants Alfredo J. Sararo, III, Sararo Holdings, LLC and Alana Sararo's Motion to Dismiss Plaintiffs' Second Amended Complaint (Dkt. 121) is **GRANTED** for lack of standing.

3.      Plaintiffs' Second Amended Complaint (Dkt. 105) is **DISMISSED with prejudice**.

4.      The Clerk is directed to terminate all pending motions, enter judgment accordingly, and **CLOSE** this case.

**DONE AND ORDERED** at Ft. Myers, Florida, on this the 28th day of July, 2011.

Charlene Edwards Honeywell
United States District Judge

COPIES TO:
COUNSEL OF RECORD